# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**GELACIO RINCON AVITIA**
        **Plaintiff,**

    v.                                                                     **Case No. 14-C-12**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Gelacio Rincon Avitia applied for social security disability benefits. Denied initially (Tr. at 56-57) and on reconsideration (Tr. at 58-59), he requested a hearing before an Administrative Law Judge ("ALJ"), but the ALJ also rejected his claim (Tr. at 10). The Appeals Council then denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final word from the Commissioner of Social Security on plaintiff's application. See Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013). Plaintiff now seeks judicial review of the ALJ's decision.

## I. APPLICABLE LEGAL STANDARDS

### A. Disability Standard

To determine whether a claimant is disabled, the ALJ follows a sequential five-step inquiry, asking: (1) whether the claimant is currently employed; (2) if not, whether the claimant has a severe impairment or impairments; (3) if so, whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if not, whether the claimant retains

the residual functional capacity ("RFC)[1] to perform his past relevant work; and (5) if not, whether the claimant can, given his age, education, work history, and RFC, perform any other work in the national economy. See 20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of presenting evidence at steps one through four, but if he reaches step five the burden shifts to the Commissioner to show that the claimant can make the adjustment to other work. Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The Commissioner may carry this burden by either relying on the Medical-Vocational Guidelines ("the Grids"), a chart that classifies a person as disabled or not disabled based on his age, education, work experience and exertional ability, or by summoning a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite his limitations. McQuestion v. Astrue, 629 F. Supp. 2d 887, 892 (E.D. Wis. 2009). The Grids consider only exertional limitations, however, so unless the claimant is deemed disabled based on strength limitations alone the ALJ may not rely solely on the chart and must consult a VE if the claimant has significant non-exertional limitations. See Fast v. Barnhart, 397 F.3d 468, 470-71 (7th Cir.

---

[1] RFC represents the most a claimant can do, despite his impairments, on a regular and continuing basis. SSR 96-8P, 1996 WL 374184, at *1. In determining RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the claimant. Exertional capacities include the claimant's ability to perform each of seven strength demands – sitting, standing, walking, lifting, carrying, pushing, and pulling. Id. at *5. These functions are typically translated into the exertional categories of sedentary, light, medium, or heavy work. Id. at *3. Non-exertional capacity includes all work-related functions that do not depend on physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting) activities. Id. at *6. The RFC assessment must be based on all of the relevant evidence in the case record, including treatment records, medical source opinions, and the claimant's statements regarding the disabling effects of his symptoms, and the ALJ must consider limitations and restrictions imposed by all of the claimant's impairments, even those that are not themselves "severe." Id. at *5.

2

2005); Luna v. Shalala, 22 F.3d 687, 691 (7th Cir.1994).

**B.    Standard of Review**

The task of the reviewing court is not to redetermine disability but rather to ensure that the ALJ applied the correct legal standards and supported his decision with substantial evidence. Bates v. Colvin, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. at 1098. The Seventh Circuit recently explained that: "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." Moon v. Colvin, No. 13-3636, 2014 WL 3956762, at *2 (7th Cir. Aug. 14, 2014). The Commissioner's lawyers may not fill in any gaps in the ALJ's decision. See Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002).

## II.  FACTS AND BACKGROUND

In his application and supporting materials, plaintiff alleged that he could not work due to back problems and arthritis, with a disability onset date of October 30, 2010. (Tr. at 158-62.) He also reported suffering from anxiety and depression. (Tr. at 185.) He listed previous employment as a municipal garbage collector from 2000 to 2010, which required him to lift 50-100 pounds and be on his feet most of the day. (Tr. at 163-64.) Plaintiff related his back pain to a May 2010 work-related injury he sustained moving a dumpster (Tr. at 221, 248), and an MRI taken in November 2010 revealed a small disc herniation at L2-L3 and mild diffuse disc bulging at L4-L5 and L5-S1. (Tr. at 206-07.) Plaintiff's primary care physician, Dr. Lorina Poe,

referred him to a neurologist, Dr. Max Lee, who recommended conservative treatment including physical therapy and injections.[2] (Tr. at 227-28.) Dr. Lee then referred plaintiff to Dr. Trinh Truong, a physical medicine and rehabilitation specialist, who treated plaintiff with physical therapy, pain medication, and injections.[3] (Tr. at 247-48, 286-88, 395.) Based on his complaints of diffuse muscle and joint pain and morning stiffness, Dr. Truong referred plaintiff to a rheumatologist, Dr. Suhail Hameed, who diagnosed rheumatoid arthritis, starting plaintiff on Plaquenil, Enbrel, and Prednisone.[4] (Tr. at 290, 309-43, 353, 356.) Dr. Hameed also obtained x-rays of plaintiff's hands, feet, hips, sacroiliac joint, and pelvis, which showed mild degenerative changes. (Tr. at 315-23.)

Dr. Truong provided two reports in support of plaintiff's application. In the first, he indicated that plaintiff's pain frequently interfered with his attention and concentration. (Tr. at 511-12.) He further opined that plaintiff could continuously walk one block, sit 30 minutes, and stand 20 minutes. (Tr. at 512.) In an eight hour day, plaintiff could sit and stand/walk less than two hours. He could rarely lift and carry less than 10 pounds, never more. (Tr. at 513.) He could rarely twist or bend, and had to avoid even moderate exposure to extreme temperatures and high humidity. Finally, Dr. Truong found that plaintiff would miss more than four days of

---

[2]Dr. Poe also treated plaintiff for diabetes and hypertension. Based on his complaints of atypical chest pain, she referred him to a cardiologist, Dr. James Mathew, who ordered testing, then recommended continued treatment of diabetes and high blood pressure and encouragement to do some regular exercise activity. (Tr. at 369, 438-41.)

[3]The therapist recommended rehabilitative therapy and a home exercise program (Tr. at 379), and plaintiff noted improved ambulation and pelvic rotation but minimal improvement in pain (Tr. at 411, 527, 532). Plaintiff told Dr. Truong that PT was not helping him. (Tr. at 470.)

[4]Dr. Hameed later switched to Remicade due to sub-optimal control and added Methotrexate. (Tr. at 591, 620.) He also prescribed Neurontin for radiculopathy. (Tr. at 595.)

4

work per month due to his impairments. (Tr. at 514.) Asked to identify other limitations on plaintiff's ability to work, Dr. Truong listed poor language skills,[5] decreased concentration, anxiety attacks, diabetes, and hypertension. (Tr. at 515.) In the second report, prepared about a year later, Dr. Truong indicated that pain <u>constantly</u> interfered with plaintiff's attention and concentration. (Tr. at 630.) He also reduced plaintiff's standing tolerance to 10 minutes and indicated that plaintiff would need three unscheduled breaks during a workday due to pain and fatigue.[6] (Tr. at 630-31.)

The agency's medical consultant, Dr. Pat Chan, reviewed the record and found plaintiff capable of light work with occasional kneeling, crouching, and crawling. (Tr. at 295-301.) A second consultant, Dr. Ronald Shaw, largely agreed, adding a limitation in handling (gross manipulation) and use of vibrating tools. (Tr. at 461-68.) A psychological consultant, Jack Spear, Ph.D., found no severe mental impairment. (Tr. at 447-59.)

At his hearing before the ALJ, plaintiff testified through an interpreter. (Tr. at 33.) He indicated that he was 46 years old and lived in a house owned by his mother with his nephew, who paid rent. (Tr. at 36-37.) He testified that he had an eighth grade education, all but one year in Mexico; he had been in the United States since 1980 but never learned to speak English. (Tr. at 38.) His previous jobs were mainly with Spanish-speaking people. He indicated that he could read street signs and could ask for a cigarette. (Tr. at 39.) However,

---

[5]Plaintiff also submitted an assessment from the Council for the Spanish Speaking, which concluded that "it is unlikely that [plaintiff] would be able to read and write in English for the purpose of consistently and correctly understanding directions or documenting information. He is better able to recognize words (reading), but is not able to comprehend English language enough to write in a way that is understandable." (Tr. at 555.)

[6]Dr. Truong did indicate improved use of the hands in the second report. (<u>Compare</u> Tr. at 514 <u>with</u> Tr. at 632.)

5

he could not read or write in English. (Tr. at 51.) Plaintiff testified that he worked as a garbage collector in Texas from 2000 to 2010 (Tr. at 39-40), which involved picking up trash bins weighing up to 50 or 60 pounds and emptying them into a truck (Tr. at 41, 50).

Plaintiff testified that he could no longer work because he "fractured" his lower back in 2010[7] and had rheumatoid arthritis. (Tr. at 41-42.) He did not undergo back surgery and was treated with injections and pain medication. He took Morphine and Oxycontin for back pain, Neurontin for nerve pain, and Methotrexate for rheumatoid arthritis. (Tr. at 42.) He testified that the Methotrexate calmed his joint pain for awhile, but then it started again. He also experienced problems in his wrists, fingers, knees, and ankles, although the swelling was better with treatment. (Tr. at 43.) He indicated that he still had low back pain from the injury, which he rated at 6 on a 0-10 scale. (Tr. at 43-44.) He indicated that he also had diabetes and hypertension, both of which were under control. (Tr. at 44.)

Plaintiff testified that activities such as lifting, carrying, and pushing objects made the pain worse. Aside from medication, he used no other strategies to cope with pain. (Tr. at 45.) He indicated that the pain interfered with sleep at night, and he sometimes slept during the day. He was able to tend to his self-care (bathing, brushing, dressing) but did so slowly due to pain. (Tr. at 46.) He did little around the house; his mother cooked, his nephew cleaned, and his sister did the laundry. He sometimes visited with a relative but engaged in no other recreation or social activities. (Tr. at 47-48.) He took walks, two blocks out and two blocks back; he got no other exercise. (Tr. at 48.) Plaintiff testified that he used to go dancing, play volleyball and basketball, but his only hobby now was watching TV. (Tr. at 49, 50.) He watched programs

---

[7]As discussed above, the medical records refer to a back injury while moving a dumpster (e.g., Tr. at 221), but not a fracture. Perhaps this was an issue of translation.

6

in Spanish and English, although he did not understand everything in English. (Tr. at 49.) He testified that he could lift no more than ten pounds. (Tr. at 50.) Bending bothered his back and stairs his knees. (Tr. at 50.)

The VE classified plaintiff's past work as a garbage collector as heavy and unskilled. The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to light work, with no work on ladders, ropes, scaffolding or at unprotected heights, only occasionally crouching, crawling, or working with or near vibration, and limited to hearing and understanding only simple instructions and communicating only simple information. (Tr. at 52.) The VE testified that such a person could not perform plaintiff's past work but could do other jobs such as housekeeper, food preparation worker, inspector/sorter, and packaging machine operator. The VE testified that all of these jobs had a GED language rating of one, the lowest. (Tr. at 52-3.) If the person would regularly be absent one to two days per month, he would not be competitively employable. (Tr. at 53.) The identified jobs would be eliminated if the person could lift no more than five pounds or stand for no more than two hours per day. (Tr. at 54.)

The ALJ subsequently issued an unfavorable decision. The ALJ determined that plaintiff had not worked since October 30, 2010, the alleged disability onset date, and that he suffered from the severe impairment of rheumatoid arthritis. The ALJ noted that plaintiff also had diabetes and hypertension, but these impairments were controlled and did not affect plaintiff's ability to work. (Tr. at 19.) The ALJ similarly determined that plaintiff's anxiety caused no more than minimal limitation in his ability to work and was thus non-severe. (Tr. at 20.) The ALJ then determined that plaintiff's rheumatoid arthritis did not qualify as conclusively disabling, as it did not cause inability to ambulate or perform fine and gross movements. (Tr. at 20-21.)

7

The ALJ found that plaintiff retained the RFC for light work, with no work on ladders, ropes, scaffolds, or at unprotected heights; only occasional crouching, crawling, or work with vibration; and in terms of communication limited to hearing and understanding only simple instructions and communicating only simple information. In making this determination, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 21.)

The ALJ summarized plaintiff's testimony, noting that plaintiff stated that he fractured his lower back in 2010, receiving an injection and pain medication for treatment. Plaintiff also stated that his rheumatoid arthritis caused swelling in his wrists, fingers, and ankles, but medication controlled it. Plaintiff asserted that he still got pain in his back at times, that activities aggravated his pain, and medications were the only thing he used to alleviate the pain. Plaintiff also asserted problems sleeping at night, and that he had to sleep during the day. He indicated that he was limited to lifting ten pounds. However, plaintiff was able to care for his personal needs, wash dishes, go for short walks, and visit with family and friends. (Tr. at 21.)

Based on the totality of the evidence, the ALJ found plaintiff's statements only "partially credible." (Tr. at 21.) The ALJ accepted that plaintiff had a medical condition that caused pain, but found his claims of constant pain, which interfered with sleep, not credible. (Tr. at 21.) The ALJ noted that plaintiff's sporadic work history over the years did not bolster his credibility. (Tr. at 21-22.) The ALJ further stated that plaintiff had been in the country since 1980, admitted that he is able to understand simple instructions and communicate simple information, and that he watched some English programs on television. (Tr. at 22.) The ALJ then found that the

medical evidence did not support plaintiff's pain complaints,[8] noting that x-rays of plaintiff's hands, feet, hips, sacroiliac joint, and pelvis showed only mild degenerative changes; that plaintiff's treating rheumatologist found only mild changes on physical examination; that plaintiff's swelling diminished since treatment started; and a recent examination noted mild tenderness in the lumbar spine, negative straight leg raise, and normal sacroiliac joint movements, with the doctor noting plaintiff's pain was under control with medication. The ALJ concluded that physical examination, multiple clinical findings, and objective testing did not support the level of impairment alleged. (Tr. at 22.)

The ALJ then turned to the medical opinion evidence, giving "little weight to the opinion of the claimant's treating doctor, Dr. Truong (Exhibits 27, 28 and 33F). His opinions are not supported by his treatment notes, which reflect the claimant's pain is controlled and examination had normal results (Exhibit 27F)." (Tr. at 22.) The ALJ gave significant weight to the opinion of the state agency physician. "The opinion that the claimant can do a limited range of light work is supported by the medical evidence of record discussed above (Exhibit 23F)." (Tr. at 22.) The ALJ added additional limitations due to plaintiff's limited understanding of

---

[8]Prior to his analysis of the medical evidence, the ALJ inserted this piece of boilerplate: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. at 22.) Courts have repeatedly condemned this language, which frequently appears in ALJ decisions. See, e.g., Moore v. Colvin, 743 F.3d 1118, 1122 (7th Cir. 2014) (collecting cases). As discussed in n.1, supra, the ALJ is supposed to consider the claimant's statements in determining RFC, rather than matching the claimant's statements against that determination, effectively forcing the testimony into a foregone conclusion. Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012). However, use of this template does not automatically discredit the ALJ's ultimate credibility finding if he otherwise provides reasons justifying it. Moore, 743 F.3d at 1122.

9

English and postural restrictions to address some of the concerns of the treating doctor. (Tr. at 22.) Finally, the ALJ noted that plaintiff's cardiologist and physical therapist recommended regular exercise, which the ALJ found inconsistent with plaintiff's allegations. (Tr. at 23.)

Based on this RFC, the ALJ found at step four that plaintiff could not perform his past work in waste and garbage pick-up. In reaching his step five conclusion, the ALJ found that plaintiff was 44 years old on the alleged onset date, a "younger individual" under the regulations, and that he had an eighth grade education and was able to communicate in English, having lived in the United States for over 30 years, with an unskilled work history. (Tr. at 23.) Considering plaintiff's age, education, work experience, and RFC, the ALJ found that plaintiff could perform other jobs, as identified by the VE, including housekeeper, food preparation worker, inspector/sorter, and packaging machine operator. (Tr. at 23-24.) The ALJ accordingly found plaintiff not disabled. (Tr. at 24.)

### III. DISCUSSION

Plaintiff challenges the ALJ's RFC for light work, indicating that a limitation to sedentary work would, for a person with his characteristics, require a finding of disabled under the Grid Rule 201.17.[9] More particularly, he argues that the ALJ erred by listing rheumatoid arthritis as the only severe impairment, finding his claims regarding the intensity and limiting effects of his

---

[9]Under that Rule, a finding of disability is required for persons aged 45-49, illiterate or unable to communicate in English, and limited to unskilled, sedentary work. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.17. As indicated above, plaintiff was 44 at the time of the alleged onset date, but he turned 45 less than a month later and was 46 at the time of the hearing. See 20 C.F.R. § 404.1563(b) ("We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case."). Plaintiff remains insured for social security disability purposes through September 30, 2015. (Tr. at 19, 144.)

10

symptoms only partially credible, and affording little weight to Dr. Truong's opinions. He further contends that the ALJ erred in finding that he can communicate in English. Plaintiff seeks an order finding him disabled under Rule 201.17 or, in the alternative, a remand for further proceedings. Unresolved factual issues regarding plaintiff's credibility, exertional capacity, and communication skills preclude an immediate award of benefits, see Briscoe, 425 F3d. at 356 ("[A]n award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability."), but given the gaps in the ALJ's analysis a remand is required.

**A.    Severe Impairment(s)**

Plaintiff first contends that the ALJ erred by finding rheumatoid arthritis the only severe impairment, overlooking his back problem. As indicated above, at step two the ALJ determines whether the claimant suffers from severe impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). "Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even one severe impairment." Arnett v. Astrue, 676 F.3d 586, 591 (7th Cir. 2012). Where, as here, the ALJ continued with the process any error at step two may be deemed harmless if the ALJ accounted for all of the claimant's limitations in determining RFC. See id; Masch v. Barnhart, 406 F. Supp. 2d 1038, 1054 (E.D. Wis. 2005); see also Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009) ("[A]n ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation."); SSR 96-8P, 1996 WL 374184, at *5 (same). The issue in the present case is thus whether the ALJ fairly considered the evidence relating to plaintiff's back impairment in evaluating credibility, the

medical opinion evidence, and, ultimately, in determining RFC.

**B.     Credibility**

Plaintiff argues that the ALJ erred in finding him only partially credible. In assessing the credibility of a social security claimant's testimony, the ALJ must apply a two-step test. First, he must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. SSR 96-7p, 1996 WL 374186, at *2. If the claimant suffers from no such impairment(s), or if the impairment(s) could not reasonably be expected to produce the claimant's symptoms, the symptoms cannot be found to affect his ability to work. Id.

If the ALJ finds that the claimant's impairment(s) could produce the symptoms alleged, he must at the second step determine the extent to which the symptoms limit the claimant's ability to work. Id. For this purpose, whenever the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record, including the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, the claimant receives; any measures other than treatment the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Id. at *2-3. The ALJ may not at the second step discredit the claimant's testimony about his pain and limitations solely because there is no objective medical evidence supporting it. Villano v. Astrue, 556 F.3d 558, 562 (7th

Cir. 2009).

The ALJ must provide "specific reasons" for his credibility determination, supported by the evidence in the case record and articulated in the decision. SSR 96-7p, 1996 WL 374186, at *4. The reviewing court will give "an ALJ's credibility determination special, but not unlimited, deference." Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012). The court must ensure that the ALJ considered the factors set forth in the regulations, id., and sufficiently articulated his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Blom v. Barnhart, 363 F. Supp. 2d 1041, 1055 (E.D. Wis. 2005). Failure to do so constitutes error necessitating remand. Hunt v. Astrue, 889 F. Supp. 2d 1129, 1147 (E.D. Wis. 2012).

In this case, the ALJ based his credibility finding primarily on plaintiff's daily activities, work history, and the medical evidence. Although it is appropriate for an ALJ to consider a claimant's daily activities when evaluating credibility, "this must be done with care." Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." Id. The activities the ALJ referenced in this case were hardly impressive – caring care for personal needs, washing dishes, going for short walks, and visiting with family and friends – and the ALJ failed to explain how they contradicted plaintiff's claim of constant pain.[10] See Villano, 556 F.3d at 562.

---

[10]The ALJ also overstated plaintiff's testimony regarding his activities. Plaintiff said that he struggled with self-care due to pain. (Tr. at 46.) He denied general housecleaning, stating: "I wash my own dish. That's it. Also it's a struggle as well." (Tr. at 47.) Asked if he visited friends and relatives, he said: "Sometimes we go and visit my aunt." (Tr. at 48.) Plaintiff also said that he took short walks – two blocks out and two blocks back – for exercise, as recommended by his doctors. (Tr. at 48.) The Seventh Circuit has cautioned ALJs against

13

A claimant's sparse work record, particularly prior to the alleged onset of disability, may also be a valid reason for discounting his credibility. See, e.g., Simila v. Astrue, 573 F.3d 503, 520 (7th Cir. 2009). Here, the ALJ stated that plaintiff had "a sporadic work history with evidence that he has been in and out of the workforce over a period of years irrespective of any alleged disability." (Tr. at 22.) However, the SSA's earnings data reflect relatively consistent income, with no earnings for just three years (1990, 1991, and 2004) between 1986 and 2010. (Tr. at 145.) The Commissioner notes that the court may not re-weigh the evidence or substitute its judgment for the ALJ's, but the court has greater freedom to review a decision resting on objective factors rather than subjective considerations like demeanor. Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004).

Finally, the ALJ found that the medical evidence did not support plaintiff's pain complaints, noting the mild degenerative changes shown on the x-rays of plaintiff's hands, feet, hips, sacroiliac joint, and pelvis; the mild changes found by plaintiff's treating rheumatologist; and Dr. Truong's recent examination noting mild tenderness in the lumbar spine, negative straight leg raise, and normal sacroiliac joint movements, with plaintiff's pain controlled by medication. However, the ALJ overlooked the results of plaintiff's November 2010 MRI, which documented a disc herniation at L2-L3 and disc bulging at L4-L5 and L5-S1. (Tr. at 207.) The record also contains physical therapy notes, which indicate that while plaintiff's gait improved to the point where he no longer needed a cane for ambulation he continued to experience

---

placing undue weight on such limited, therapeutic exercise. See Scrogham v. Colvin, No. 13-3601, slip op. at 32 (7th Cir. Aug. 27, 2014) (citing Carradine v. Barnhart, 360 F.3d 751, 756 (7th Cir. 2004); Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)).

14

significant low back pain and difficulty standing.[11] (Tr. at 293, 390, 398, 411, 527, 529.) The ALJ referenced just one page of the physical therapy records, an early notation that plaintiff needed rehabilitative therapy and a home exercise program (Tr. at 23, 379), which the ALJ found inconsistent with plaintiff's allegations. But the ALJ failed to explain why the recommendation from plaintiff's therapist (and also his cardiologist) that plaintiff regularly exercise was inconsistent with plaintiff's claims. See also Scrogham, slip op. at 32 (faulting ALJ for relying on therapeutic walking to discount credibility of pain complaints). Finally, while the ALJ noted that during one evaluation Dr. Truong found plaintiff's pain controlled with medication, he did not consider whether the doctor's prescription of strong pain medications lent credence to plaintiff's pain complaints. See id. at 32-33. While the ALJ need not discuss every piece of evidence in the record, he cannot select and discuss only that which supports his conclusion. Baker ex rel. Baker v. Barnhart, 410 F. Supp. 2d 757, 768 (E.D. Wis. 2005) (citing Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001)). The matter must be remanded for further consideration of the entire record.

**C.    Dr. Truong's Opinions**

Plaintiff next contends that the ALJ erred by giving little weight to Dr. Truong's opinions. Opinions from a social security claimant's treating physician are entitled to "special significance" in determining RFC. SSR 96-8p, 1996 WL 374184, at *7. If the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not

---

[11]It appears that at the time of his discharge from PT plaintiff's functional capacity had improved to the point where he could walk ½ mile with an activity tolerance of up to one hour. (Tr. at 553.) The ALJ should on remand consider this evidence is deciding whether plaintiff can sustain light work, which requires standing or walking for a total of about six hours of an eight hour workday. SSR 83-10, 1983 WL 31251, at *6.

15

inconsistent with the other substantial evidence in the record, the ALJ must give it "controlling weight." 20 C.F.R. § 404.1527(c)(2). If the ALJ finds that a treating source's opinion does not meet the standard for controlling weight, he may not simply discard it; rather, he must determine what weight the opinion does deserve by considering a variety of factors, including the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. Scrogham, slip op. at 23-24. Whenever an ALJ discounts a treating source's opinion, he must provide "good reasons." Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011). The contradictory opinion of a non-examining physician will not, by itself, justify the rejection of a treating source opinion. Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).

In the present case, the ALJ's analysis was conclusory. He gave "little weight" to Dr. Truong's opinions because they "are not supported by his treatment notes, which reflect the claimant's pain is controlled and examination had normal results (Exhibit 27F)." (Tr. at 22.) Exhibit 27F consists of just three pages – treatment notes from August 8, 2012 and June 13, 2012 and a physical therapy order dated April 11, 2011. (Tr. at 508-10.) The ALJ failed to discuss the nature and extent of plaintiff's treating relationship with Dr. Truong, which began in December 2010 (Tr. at 248), including the other treatment notes in the record documenting the prescription of strong pain medications (Oxycodone and MS Contin) and a right sacroiliac joint injection, with plaintiff's pain persisting despite this treatment (Tr. at 290, 470-77) and physical therapy (Tr. at 532.)[12] Nor did the ALJ consider Dr. Truong's speciality of physical

---

[12]The ALJ also overlooked Dr. Truong's statement regarding the side effects of medication, including sedation and fatigue (Tr. at 63), in rejecting plaintiff's testimony that he

16

medicine and rehabilitation. Dr. Truong initially suspected arthritis, recommending a rheumatology consult. (Tr. at 290.) Dr. Hameed then diagnosed rheumatoid arthritis, prescribing several different medications in an effort to bring plaintiff's symptoms under control. (Tr. at 604, 620.)

The ALJ "gave significant weight to the opinion of the state agency physician . . . that the claimant can do a limited range of light work [because it] is supported by the medical evidence of record discussed above (Exhibit 23F)." (Tr. at 22.) As noted, the contrary opinion of a non-examining consultant will not suffice to reject a treating source opinion. Nor will a conclusory statement that one opinion is supported by the evidence, while the other is not, suffice. See Moore, 743 F.3d at 1124 ("The error here is the failure to address all of the evidence and explain the reasoning behind the decision to credit some evidence over the contrary evidence, such that we could understand the ALJ's logical bridge between the evidence and the conclusion.").

## D. Ability to Communicate in English

Finally, plaintiff challenges the ALJ's finding that he can communicate simple information in English. The Commissioner responds that, for the unskilled jobs identified by the VE and relied upon by the ALJ at step five, literacy or ability to communicate in English has limited significance. For persons under age 45, the Commissioner is right.

> While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance. . . . Thus, the functional capability for a full range of sedentary work represents sufficient numbers of jobs to indicate

---

sometimes slept during the day.

17

> substantial vocational scope for those individuals age 18-44 even if they are illiterate or unable to communicate in English.

20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(i). The Rules also direct a finding of not disabled for a person aged 18-49 and capable of light work, even if illiterate or unable to communicate in English. Id. § 202.00(g).

However, plaintiff turned 45 less than a month after he filed the application, and his doctor limited him to sedentary work. Under the Grids, a finding of "disabled" is warranted for individuals age 45-49 who (i) are restricted to sedentary work, (ii) are unskilled or have no transferable skills, (iii) have no past relevant work or can no longer perform past relevant work, and (iv) are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English. Id. §§ 201.00 (h)(1) & 201.17. Thus, plaintiff's literacy and ability to communicate in English may be highly relevant on remand. The ALJ's current finding on that issue cannot stand.

The ALJ stated that plaintiff, who had been in the country for 30 years, admitted that he could understand simple instructions and communicate simple information. The testimony was not so clear. The ALJ asked, "And you never learned to speak English in 30 years here?" Plaintiff responded, "No. Because I only studied for one year here." (Tr. at 38.) Plaintiff denied taking English classes or picking up English from co-workers, indicating that he mainly worked with Spanish-speaking people. (Tr. at 38-39.) The ALJ asked if plaintiff could "give me a simple communication in English of any kind?" (Tr. at 39.) Plaintiff responded, "No, no." (Tr. at 39.) The ALJ persisted, "Let's say, for example, you wanted a cigarette and I had some cigarettes, could you ask me for a cigarette?" (Tr. at 39.) Plaintiff responded, "Yes. That's easy. I can do that." (Tr. at 39.) However, plaintiff immediately added, "I understand some

18

things but I cannot speak it." (Tr. at 39.) The record also contains an assessment from the Council for the Spanish Speaking that "it is unlikely that [plaintiff] would be able to read and write in English for the purpose of consistently and correctly understanding directions or documenting information" (Tr. at 555), which the ALJ did not discuss. The ALJ must revisit this issue on remand.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 28th day of August, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge

19